The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Richard B. Ford and the briefs on appeal. Oral arguments were waived by agreement of the parties. The appealing party has not shown good ground to receive further evidence or to amend the holding of the prior Opinion and Award. However, pursuant to it authority under G.S. 97-85, the Full Commission has modified the Deputy Commissioners decision and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing on 29 April 1999 as:
 STIPULATIONS
1. On 10 May 1994, the parties were bound by and subject to the North Carolina Workers Compensation Act.
2. On said date an employer-employee relationship existed between the parties.
3. As of said date, defendant-employer was self-insured administered by GAB as provided under said Act.
4. Plaintiff sustained an injury by accident arising out of and in the course of the employment with defendant on 10 May 1994.
5. On said date, plaintiff was earning an average weekly wage of $349.14.
6. Plaintiff began working for defendant on 28 February 1985.
7. Plaintiff is claiming in this action compensation from 8 September 1997, medical expenses and permanent partial disability compensation benefits.
8. Defendant stipulates that plaintiff has sustained, as a result of the injury on 10 May 1994, permanent partial disability of fifteen percent (15%) of his back.
9. The parties also stipulated to medical records attached to the Pre-Trial Agreement.
10. The issues to be determined in this case are:
 a. Are the injuries of which plaintiff complains caused by the accident occurring on 10 May 1994.
 b. Is plaintiff justified under the provisions of the North Carolina Workers Compensation Act in refusing work offered by defendant.
 c. Has plaintiff misrepresented the effect of the injury of 10 May 1994 on his physical condition.
 d. To what compensation, if any, is plaintiff entitled under the Act.
 * * * * * * * * * * *
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing on 29 April 1999, plaintiff was a forty-five year old male who had been working for defendant since 1985 in various jobs.
2. On 10 May 1994, plaintiff had been working for approximately two weeks "picking product in the shipping department and loading it onto a walkie-rider. On that date, plaintiff attempted to pick an object off of the floor and felt something pull in his back. Plaintiff continued to finish loading and dumping the load and then reported the injury to his supervisors.
3. Defendant sent plaintiff to Dr. John L. Bond where he was treated conservatively for a low back strain. Following two weeks of physical therapy, Dr. Bond released plaintiff to return to work on a modified or light duty schedule. Plaintiff was placed on light duty, but found he could not perform the job he was given and was told by his supervisors to go home.
4. A Form 21 Agreement for Compensation was entered by the parties and approved by the Commission on 19 July 1994.
5. On 21 July 1994, plaintiff presented to orthopedic surgeon Dr. Ira Saltzman with complaints of lower back and left leg pain. Dr. Saltzman placed plaintiff on medication and prescribed three epidural blocks. Plaintiff did not realize any improvement from this treatment. Dr. Saltzman ordered an MRI which was performed on 2 August 1994 and which revealed a central L5-6 small disk herniation and a large L4-5 disk herniation. Dr. Saltzman discussed the possibility of surgery, but plaintiff declined. Dr. Saltzman continued to treat plaintiff conservatively and released him to attempt to return to work for four hours per day.
6. Plaintiff presented to Dr. Saltzman on 12 September 1994 with continuing complaints of pain. Dr. Saltzman told plaintiff that he would not consider surgery until plaintiff began to demonstrate some weakness which would warrant surgical intervention. At the clinical examination performed thereafter, plaintiff began to exhibit weakness during the subjective portions of the exam. Dr. Saltzman referred plaintiff to orthopedist Dr. Mark Rogers for a second opinion.
7. Dr. Rogers examined plaintiff on 6 October and 12 October 1994 and noted degenerative disk changes in the lower two disks, with no instability visible on x-rays. Dr. Rogers opined that plaintiffs complaints of pain were the result of degenerative disk disease, and that surgery would not help him. He recommended that plaintiff go back to work at light duty, and that he receive job-site counseling with a physical therapist or occupational therapist. In addition, he suggested plaintiff might benefit from a month of work-hardening.
8. Pursuant to Dr. Rogers recommendations, Dr. Saltzman entered plaintiff in a physical therapy program. Plaintiff returned to Dr. Saltzman on 11 November 1994 with complaints of increased pain. Plaintiff requested that he receive surgery on his back.
9. On 13 December 1994, Dr. Saltzman performed a left-sided hemilaminotomy, foraminotomy, and diskectomy, at both the L4-5 and L5-S1 levels. Plaintiff was released from the hospital on 18 December 1994.
10. A follow-up examination on 26 January 1995 revealed good alignment of the bones where the decompression had occurred. Plaintiffs skin incision had healed well and there were no muscle hernias. Dr. Saltzman placed plaintiff back in a work-hardening program.
11. On 13 February 1995 Dr. Saltzman attempted to get plaintiff back to work with the restrictions of no heavy lifting and to work mornings only so that plaintiff could go to physical therapy in the afternoons. However, defendant had no available jobs within these restrictions.
12. On 21 February 1995, plaintiff reported to Dr. Saltzman that he injured himself on a machine in therapy, but there was no such notation in the documentation by the therapist. On 9 March 1995, Dr. Saltzman released plaintiff to return to work at a maximum of eight hours per day and forty hours per week, with restrictions lifting of ten pounds on a regular basis, fifteen pounds on a frequent basis, no lifting above shoulder level or picking things up below knee level, and sitting ninety percent of the time.
13. On 15 March 1995, plaintiff returned to work at a temporary position in defendants distribution center for four hours per day. On 10 April 1995 plaintiff reported to Dr. Saltzman that he had trouble when the hours were increased to five per day. There were no objective findings to support plaintiffs problems, but Dr. Saltzman changed plaintiffs restrictions to four hours per day for an additional month, with standing for five minutes every half hour.
14. By 5 June 1995 plaintiff was working six hours a day followed by two hours of formal therapy. Dr. Saltzman increased plaintiff to eight hours a day of work, to be followed by plaintiff doing his own therapy at home. The other restrictions remained the same.
15. A functional capacity evaluation was performed on 18 July 1995 by Bob Farmer at Health South Rehabilitation. Mr. Farmer noted positive Waddells findings in plaintiffs reaction to light touch and in his give-way weakness on strength testing on multiple nerve roots. He also concluded that plaintiff engaged in mild to moderate symptom magnification, over-reaction during muscle testing, and positive findings on a Ransford pain drawing showing pins and needles, burning, stabbing and numbness occurring all at the same time. Plaintiff also exhibited a submaximal effort as a result of his failure to try to engage in certain activities and as a result of his abnormal result on a hand position grip test. For these reasons, Mr. Farmer concluded that the functional capacity evaluation was invalid due to plaintiffs inconsistent efforts during the examination.
16. On 28 July 1995, Dr. Saltzman examined plaintiff and noted that his clinical exam did not support plaintiffs level of discomfort.
17. On 25 September 1995 Dr. Saltzman okayed a job offered to plaintiff by defendant which required plaintiff to carry a clip board and ink pen while walking up and down aisles making sure the correct product was in the correct bin. No lifting was required. Plaintiff began performing this job in September 1995.
18. Plaintiff next presented to Dr. Saltzman on 16 October 1995 with complaints of increased pain. Despite plaintiffs complaints, Dr. Saltzman determined that plaintiff had reached maximum medical improvement and gave him a fifteen percent permanent partial disability rating of his back. Plaintiff was released to return to work with the permanent restrictions of it being a sedentary job with the lifting restrictions which had already been established.
19. In October 1995, plaintiff began working as a quality auditor, where he was required to check boxes of small parts that were placed in a large box to be sent to individual stores. The maximum weight of a part was fifteen pounds. The large boxes were transported by other employees to and from plaintiffs work station. If plaintiff deemed any part too heavy to lift, his co-employees were instructed to assist him. A space heater was provided at plaintiffs feet, and another one was suspended above his head. Plaintiff remained at this job until Spring 1997. Dr. Saltzman testified that this job was within plaintiffs restrictions.
20. Plaintiff return to Dr. Saltzman on 26 August 1996 complaining of lower back pain radiating into both buttocks, both posterior legs and both calves to the bottom of both feet. Dr. Saltzman decreased plaintiffs lifting requirements to five pounds for two weeks, and otherwise treated plaintiff with medication.
21. Following an examination of plaintiff on 9 September 1996, Dr. Saltzman wanted to return plaintiff to his normal job, lifting no more than twenty-five pounds occasionally, twenty pounds repeatedly, and no more than fifteen pounds frequently. Plaintiff stated that he did not think he could perform at that capacity.
22. The quality audit job was phased out in April 1997. Plaintiff was offered a job identified as a break pack/stock picker. A job description along with a video of the job were presented to Dr. Saltzman who approved the job for plaintiff. Plaintiff began performing the job in April 1997.
23. After attempting the break pack job for a few days, plaintiff began seeing his family physician Dr. Ken Curl. Dr. Curl was not plaintiffs authorized treating physician, and defendant are not responsible for providing for Dr. Curls treatment.
24. Occupational therapist Al Gorrod performed an ergonomic evaluation of the job on 9 September 1997, and testified that it was the same job as described in both the written description and video tape presented to Dr. Saltzman. He further testified that the job was within the lifting restrictions recommended by Dr. Saltzman on 9 September 1996.
25. On 10 July 1997, plaintiff was evaluated by Dr. Craig Derian. Dr. Derian agreed with the fifteen percent permanent partial disability rating given by Dr. Saltzman, and recommended work restrictions of no lifting over fifteen pounds occasionally, no prolonged or repetitive bending, lifting and stooping, and allowing frequent position changes from sitting to standing to walking as needed. After reviewing the ergonomic study performed by Mr. Gorrod, Dr. Derian testified that the break pack/stock picker job was within plaintiffs restrictions and plaintiff was capable of performing the job.
26. Plaintiff stopped working for defendant-employer on 8 September 1997 without authorization from his treating physician.
27. On 6 November 1997, plaintiff sought unauthorized treatment from neurosurgeon Dr. David Kelly. Dr. Kelly noted degenerative disk disease at L4-5 which was unrelated to plaintiffs surgery. He further noted diffuse tenderness throughout plaintiffs back, but attributed it to the degenerative disk disease and not to the surgery. He found no evidence of a pinched nerve and no hindrance to plaintiffs circulation to his lower extremities. Dr. Kelly did not review plaintiffs job, nor did he provide a disability rating.
28. Plaintiff returned to Dr. Saltzman on 21 November 1997. Dr. Saltzman reiterated his restrictions of 9 September 1996, and found no objective reason why plaintiff could not work within those restrictions. Plaintiffs description of his job to Dr. Saltzman was not consistent with the video tape of the job or the evaluation done by Mr. Gorrod. However, based on plaintiffs statements, Dr. Saltzman ordered that he be moved to a sedentary, not necessarily sitting, job.
29. Defendants did not have a job available within Dr. Saltzmans new restrictions, so they re-instituted temporary total disability payments.
30. During the winter months of 1997-1998, while plaintiff was out of work, he testified that on more than one occasion he went deer hunting with his son in the early morning hours when temperatures were in the 30 to 40 degree range. While so doing, plaintiff either sat on the ground or used a deer stand which necessitated his climbing a tree. Further, while working at the break pack job between April 1997 and September 1997, after work plaintiff would frequently go to Save City, a wholesale store, where for two to three hours he stood or sat watching the store and assisting customers. A private investigator observed plaintiff opening the store on occasion, and pulling garment racks and a jack out of the store and on to the sidewalk. Four days after this activity was observed, plaintiff contacted defendant-employers personnel assistant, Shirley Inscore, and told her he was in constant pain and had to lie down to relieve his symptoms. He also told her that he could not get out of the house much due to the cold weather, and that he was certain defendant did not have any jobs he could perform.
31. Dr. Saltzman last saw plaintiff on 9 February 1998. At that time he restated plaintiffs work restrictions of no lifting greater than fifteen pounds, no repetitive lifting below the knees or above the shoulder, stooping and squatting infrequently, and able to change positions frequently as needed. Again, Dr. Saltzman stated that plaintiff could perform the break stock job so long as he was not required to squat on one knee more frequently than twenty-five percent of the time.
32. Plaintiff underwent an independent medical evaluation performed by Dr. Alfred Rhyne, III on 20 May 1998. Dr. Rhyne found no change of condition in plaintiff since he received his final rating from Dr. Saltzman on 16 October 1996, and he agreed with the fifteen percent permanent partial disability rating Dr. Saltzman gave plaintiff at that time. His examination revealed no nerve irritation and no sign of abnormal function of any nerve rootlets that compose the sciatic nerve. He determined that either plaintiff was suffering from a residual chronic pain from a nerve injury, or that plaintiff was malingering for alternative gains. Dr. Rhyne also found positive Waddells signs for superficial tenderness at the lumbar spine. He also found that at a minimum, plaintiff was able to return to work at full duty of eight hours a day. After reviewing the ergonomic evaluation performed by Mr. Gorrod and the video of the job itself, Dr. Rhyne stated that plaintiff was capable of performing the break stock position.
33. Dr. Rhyne ordered a month of work conditioning, followed by a functional capacity evaluation. The FCE revealed significant Waddells signs, exaggeration of pain and lack of cooperation with physical therapy. During a re-examination of plaintiff on 1 July 1998, Dr. Rhyne again noted overt signs of malingering, theatrics, and exaggeration of pain.
34. Plaintiff returned to work on 15 July 1998. Plaintiff was permitted to pick the department where he wished to work. Plaintiff works in the small plumbing parts department, where the maximum weight he required to lift is five pounds. Plaintiff has been provided with a chair and has assistance when orders are heavy. Plaintiff has been permitted to rest anytime he needs to, and may rotate to another department upon request.
35. Plaintiffs current job is within his medical restrictions.
36. Plaintiff unjustifiably refused suitable employment when he left work on 8 September 1997.
37. Plaintiffs allegation of a disabling injury during the period from 8 September 1997 through 15 July 1998 is deemed not credible.
38. The restrictions placed on plaintiffs work by Dr. Saltzman on 21 November 1997 were based on misinformation supplied by plaintiff, and were not based on sound medical reasoning.
 * * * * * * * * * * *
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. The Form 21 Agreement for Compensation which was approved by the Commission on 19 July 1994 created a rebuttable presumption of continuing total disability in plaintiffs favor.Kisiah v. W.R. Kisiah Plumbing, 124 N.C. App. 72,476 S.E.2d 434 (1996), disc. rev. denied, 345 N.C. 343,483 S.E.2d 169 (1997).
2. Defendants rebutted the presumption of continued disability by proving that plaintiff unjustifiably refused suitable employment when he left work on 8 September 1997. Id.
Therefore, plaintiff was not eligible for any compensation benefits for the period during which such refusal continued, or until 15 July 1998 when he returned to work. G.S. 97-32; G.S.97-29.
3. Defendant is entitled to a credit for temporary total disability benefits which were paid between 8 September 1997 and 15 July 1998 as these payments were not due and payable when made. G.S. 97-42.
4. Plaintiff is entitled to forty-five weeks of permanent partial disability payments for a fifteen percent disability rating to his back in the amount of $10,479.60. G.S. 97-31(23).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay plaintiff a lump sum amount of $10,479.60 for a fifteen percent permanent partial disability to his back, subject to a credit and attorneys fees discussed below.
2. Defendants shall deduct from the lump sum payment awarded above the amount paid in temporary total disability payments from 9 September 1997 through 15 July 1998.
3. To the extent that there is any remaining award subsequent to the deduction allowed in paragraph 2 above, defendants shall pay twenty-five percent of the remaining amount directly to plaintiffs counsel as a reasonable attorneys fee.
4. Each side shall pay its own costs.
 S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ ____________________ DIANNE C. SELLERS COMMISSIONER
S/ ____________________ THOMAS J. BOLCH COMMISSIONER